139 F.3d 80
 55 Soc.Sec.Rep.Ser. 939, Medicare & Medicaid Guide
P 46,134
Concetta DeSARIO and Betty Emerson, Individually & o/b/o all
others similarly situated, Plaintiffs-Appellees,
Caroline Stevenson and Thomas Slekis, Intervenors,
v.
Joyce A. THOMAS, Commissioner CT Dept. of Social Services,
Defendant-Third-Party Plaintiff-Appellant,
Donna Shalala, Commissioner, United States Department of
Health and Human Services, Third-Party Defendant.
 No. 289, Docket 97-6027.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 24, 1997.
Decided Feb. 24, 1998.
 
 Judith A. Merrill, Assistant Attorney General, Hartford, CT (Richard Blumenthal, Attorney General of the State of Connecticut, Richard J. Lynch, Assistant Attorney General, of counsel), for Defendant-Third-Party Plaintiff-Appellant.
 Sheldon V. Toubman, New Haven, CT (Shelley A. White, New Haven Legal Assistance Association, Inc., Sue Garten, Legal Aid Society of Hartford County, Inc., of counsel), for Plaintiffs-Appellees and Intervenors.
 Before: JACOBS and CALABRESI, Circuit Judges, and BRIEANT, District Judge*.
 JACOBS, Circuit Judge:
 
 
 1
 This appeal requires us to consider the latitude afforded the states under the Medicaid program to establish the scope of their Medicaid coverage. The Medicaid program, enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. ("Title XIX"), is a joint state and federal program that administers health care to financially and medically needy individuals. The program is run primarily by the states, in conformity with federal guidelines, on the basis of each state's Medicaid plan. Title XIX lists certain services that the state Medicaid plan must or may provide. One of them is "home health care services," 42 U.S.C. § 1396d(a)(xi)(7), which the federal regulations define to include "[m]edical supplies, equipment, and appliances suitable for use in the home," 42 C.F.R. § 440.70(b)(3) (1996); the regulations contain no further explanation of these services. Coverage of "home health care services" is mandatory for certain groups of eligible individuals and optional for others; however, Connecticut has chosen to provide these services to all Medicaid recipients. State of Connecticut, Department of Income Maintenance, Connecticut Medical Assistance Provider Manual for Medical Equipment, Devices and Supplies § 189.D ("MAP Manual ").
 
 
 2
 At issue on this appeal is Connecticut's coverage of durable medical equipment ("DME"). The MAP Manual, the state manual which explains Connecticut's coverage of the items listed in its title, defines "Durable Medical Equipment" as follows:
 
 
 3
 "DME" means equipment which meets all of the following requirements:
 
 
 4
 a. Can withstand repeated use
 
 
 5
 b. Is primarily and customarily used to serve a medical purpose
 
 
 6
 c. Generally is not useful to a person in the absence of an illness or injury
 
 
 7
 d. Excludes items that are disposable.
 
 
 8
 MAP Manual § 189.B; see also Conn. Agencies Regs. § 17-2-80B. Section 189.E.II.a of the MAP Manual limits covered DME "to those [items] listed in the Department's fee schedule." The fee schedule, adopted in June 1993, and then revised in June 1996, contains over 100 different items of DME. MAP Manual § 189.E.III.a specifically excludes certain equipment and appliances from coverage:
 
 
 9
 Durable Medical Equipment and Related Services not Covered:
 
 
 10
 a. DME, including, but not limited to:
 
 
 11
 1. Roomsize humidifiers, purifiers (including electronic air filters), and dehumidifiers
 
 2. Air conditioners
 
 12
 3. Stair glides....
 
 
 13
 (emphasis added). In order to obtain reimbursement, a Connecticut Medicaid recipient must obtain prior authorization for all DME rentals, replacement DME, and all DME costing over $100. MAP Manual § 189.F.II.a.
 
 
 14
 Plaintiffs, as representatives of similarly situated Medicaid recipients, challenge decisions by the Connecticut Department of Social Services ("DSS" or "Connecticut"), based on MAP Manual §§ 189.E.II.a and 189.E.III.a, denying their prior authorization requests seeking Medicaid reimbursement for certain items to which they claim entitlement as DME. The defendant Joyce A. Thomas is Commissioner of DSS.[1] The district court certified two subclasses of plaintiffs:
 
 
 15
 The "Emerson subclass," which consists of Medicaid recipients whose requests for DME were denied based on MAP Manual § 189.E.III.a. DeSario v. Thomas, 963 F.Supp. 120, 141 (D.Conn.1997). The representative plaintiffs for this subclass are Elizabeth Emerson, who requested prior authorization for an air purifier and an air conditioner, and Caroline Stevenson, who sought prior authorization for an air purifier and a roomsize humidifier; both suffer from multiple chemical sensitivity.
 
 
 16
 The "Desario subclass," which consists of Medicaid recipients whose DME requests were denied based on MAP Manual § 189.E.II.a, i.e., because the requested DME were not on DSS's fee schedule. DeSario, 963 F.Supp. at 141. The representative plaintiff is Concetta DeSario, who is a quadriplegic and who requested payment for an environmental control unit, an electronic device that centrally controls many appliances and costs approximately $7000-$8000.
 
 
 17
 In addition, Thomas Slekis intervened in the action; he suffers from severe skin breakdown and sought payment for a "RIK" mattress (a mattress filled with an oil-based liquid and covered with exceptionally loose-fitting sheets that costs approximately $840 a month to rent). Slekis sought approval for his request and temporary injunctive relief ordering DSS to provide the mattress during the course of the litigation. After an evidentiary hearing, the district court granted the requested temporary relief.
 
 
 18
 Plaintiffs moved for a preliminary injunction. The district court found that plaintiffs failed to establish a likelihood of success on their claim that the use of a list to determine covered DME was a per se violation of Title XIX. DeSario, 963 F.Supp. at 131-32. However, the court found that the particular fee schedule used by DSS improperly limits the amount, duration and scope of medically necessary DME because: (i) "the defendant does not have any procedure for systematically, timely, or effectively updating this dispositive list as new equipment comes on the market even if the new items meet the defendant's general definition of 'durable medical equipment' "; and (ii) "the defendant's policies and operation of the prior approval system lack any mechanism by which a recipient can demonstrate that an item of unlisted but medically necessary equipment otherwise meets the definition of DME, such that it can be added to the list or otherwise be considered for prior approval." Id. at 130.
 
 
 19
 Further, the district court found that the regulation excluding air conditioners, air purifiers and roomsize humidifiers from coverage--MAP Manual § 189.E.III.a--violated Title XIX because "the defendant may not categorically exclude a piece of DME without considering the medical necessity of an item either on a 'macro' or 'micro' level," DeSario, 963 F.Supp. at 133, and the court found that the defendant had not evaluated the medical necessity of this equipment on any level. Id. at 133-34. The court stated:
 
 
 20
 [T]he defendant has never stated in her briefs or through the testimony of Elizabeth Geary that air conditioners, air purifiers, and room humidifiers are never of sufficient medical necessity to treat certain medical conditions. Instead, the defendant has taken the position that the requested equipment [is] excluded from coverage under her definition of DME because the items are useful to individuals in the absence of illness or injury.
 
 
 21
 Id. at 133.
 
 
 22
 Accordingly, the court enjoined DSS "from using Conn. MAP Manual § 189.E.II.a and § 189.E.III.a as the exclusive determinant of plaintiffs' preauthorization requests for durable medical equipment" and ordered that plaintiffs be permitted to resubmit their requests. Id. at 140. The court also ordered that the state pay the cost of Slekis's RIK mattress during the pendency of the litigation. Id. at 141. Having won the opportunity to resubmit their requests, plaintiffs moved for clarification of the order to address DSS's requirement--imposed as a condition to approval of prior authorization requests for DME that is not scheduled on the fee schedule--that applicants demonstrate that the scheduled medical equipment is inadequate with respect to the needs of the Medicaid population. The district court ruled that DSS could not impose that precondition in the future. Id. at 142-43. Finally, the district court expanded the injunction to cover all members of the Emerson and DeSario subclasses.
 
 
 23
 On appeal, DSS claims that the district court erred in finding that plaintiffs were likely to succeed in proving that DSS's regulations violated Title XIX of the Social Security Act and its regulations. Because the district court misinterpreted Title XIX and miscalculated the likelihood of plaintiffs' success on the merits, we vacate the injunction and remand for further proceedings.
 
 DISCUSSION
 
 24
 We first address two threshold issues raised by the defendant, and then consider the propriety of the relief ordered by the district court.
 
 
 25
 * A. Adequate Remedy at Law
 
 
 26
 Defendant first claims that an adequate remedy at law is afforded by the availability of a state appeal from DSS's decision to deny plaintiffs' prior authorization requests, and that although the district court had jurisdiction over this action, it could not order injunctive relief. DSS directs our attention to two Second Circuit cases, Potwora v. Dillon, 386 F.2d 74 (2d Cir.1967) and Wallace v. Kern, 520 F.2d 400 (2d Cir.1975). We conclude that both cases are (at least) out of step with more recent Supreme Court decisions confirming that no exhaustion of remedies requirement applies to section 1983 cases.
 
 
 27
 In Potwora, the plaintiff sought the return of allegedly obscene books that had been confiscated by state authorities. We noted that the state provided a remedy for the return of property seized through an unlawful search and seizure and that if this remedy was adequate, we would be precluded from ordering the state to return the books. We relied heavily on the Supreme Court's decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled on other grounds, Monell v. Department of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which identified three Congressional objectives promoted by section 1983: "First, the statute overrode invidious state law; second, it provided a federal remedy where the state's was inadequate on its face; 'the third aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice.' " Potwora, 386 F.2d at 77 (quoting Monroe, 365 U.S. at 173-74, 81 S.Ct. at 477). In holding that a section 1983 plaintiff need not exhaust his state judicial remedies, Monroe stated:
 
 
 28
 It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.
 
 
 29
 Monroe, 365 U.S. at 183, 81 S.Ct. at 482. In Potwora, we gave this passage a narrow reading in light of Monroe 's narrow view of Congress's intention in enacting section 1983:
 
 
 30
 [This passage] simply emphasizes that the federal court must be certain that a remedy that seems "adequate in theory" will be "available in practice"; it is not enough that the state statute will be adequate "if enforced." Monroe v. Pape was an action for damages and the quoted statement must be read in that light; the Court surely had no intention to abrogate in civil rights cases the historic rule ... that suits in equity shall not be sustained in courts of the United States "in any case where a plain, adequate and complete remedy may be had at law."
 
 
 31
 Potwora, 386 F.2d at 77; see also Wallace, 520 F.2d at 407 n. 13 (noting that cases limiting exhaustion of state judicial remedies requirement in section 1983 cases "do[ ] not ... alter the traditional equitable principle that a plaintiff seeking equitable relief must demonstrate that no adequate remedy at law exists and that, absent injunctive relief, he will suffer irreparable injury"). In the end, we found the available state remedy inadequate and therefore ordered the state to return the books.
 
 
 32
 Potwora 's narrow reading of Monroe is no longer tenable. The Supreme Court has said that even if the state remedy is available in practice, it need not be exhausted before bringing a section 1983 suit. See Patsy v. Board of Regents, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982). In Patsy, the Supreme Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." Id.; see also Felder v. Casey, 487 U.S. 131, 147, 108 S.Ct. 2302, 2311, 101 L.Ed.2d 123 (1988); Wilbur v. Harris, 53 F.3d 542, 544 (2d Cir.1995); Alacare, Inc.-North v. Baggiano, 785 F.2d 963, 970 (11th Cir.1986) (holding that exhaustion of remedies was not required in section 1983 action alleging violation of Medicaid Act). From the legislative history of the Civil Rights Act of 1871 (the precursor of section 1983), Patsy drew the conclusions (i) that "Congress assigned to the federal courts a paramount role in protecting constitutional rights," 457 U.S. at 503, 102 S.Ct. at 2561, (ii) that the statute was intended "to provide dual or concurrent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief," id. at 506, 102 S.Ct. at 2563, and (iii) that it is "fair to infer that the 1871 Congress did not intend that an individual be compelled in every case to exhaust state administrative remedies before filing an action under § 1," id. at 507, 102 S.Ct. at 2563.
 
 
 33
 This categorical statement that exhaustion is not required, and this expansive view of the federal role in protecting constitutional rights, are incompatible with Potwora 's interpretation of Monroe and section 1983.[2] We therefore conclude that the availability of a state appeal from the adverse DSS decision does not bar injunctive relief for plaintiffs.[3]
 
 B. Res Judicata
 
 34
 Defendant argues next that plaintiffs failed to raise their section 1983 claims in their administrative hearings or in subsequent state court appeals, and that their claims are therefore barred by res judicata.
 
 
 35
 DeSario and Emerson took an administrative appeal of DSS's decision to deny their prior authorization requests. When the fair hearing officer denied their appeals, they brought this action. Stevenson took an administrative appeal and upon its denial, intervened in this action. Slekis did not bring an administrative appeal of DSS's denial.
 
 
 36
 The Circuits are split on whether a federal suit arising out of the same transaction(s) as a state administrative decision that has not been reviewed in state court is barred by res judicata. Compare Dionne v. Mayor and City Council, 40 F.3d 677, 685 (4th Cir.1994) (no res judicata); Gjellum v. City of Birmingham, 829 F.2d 1056, 1065 (11th Cir.1987) (same), with Miller v. County of Santa Cruz, 39 F.3d 1030, 1034-35 (9th Cir.1994) (applying res judicata).
 
 
 37
 The only seemingly relevant Second Circuit case, Greenberg v. Board of Governors of the Federal Reserve System, 968 F.2d 164 (2d Cir.1992), arose in a different context. There, we stated that "res judicata applies to judgments by courts and by administrative agencies acting in a judicial capacity." Id. at 168. But the underlying ruling was by a federal administrative agency and the question was whether an earlier federal administrative determination would bind the same agency in subsequent proceedings. We did not decide the possibly distinct issue that Connecticut asks us to decide here: the preclusive effect of an unreviewed state administrative proceeding on a subsequent section 1983 action.
 
 
 38
 We need not decide that issue in this case because, even if we were to conclude that unreviewed state administrative proceedings bar subsequent claims arising out of the same transaction, res judicata would not operate here to defeat plaintiffs' claims.
 
 
 39
 The Supreme Court has held that state administrative fact finding unreviewed by a state court has preclusive effect in a subsequent section 1983 proceeding if the states in which those adjudications occurred would give them preclusive effect, and if the administrative proceedings satisfy three requirements: (1) the administrative agency acted in a judicial capacity; (2) the agency resolved disputed issues of fact properly before it; and (3) the parties had a full and fair opportunity to litigate the relevant factual issues. University of Tennessee v. Elliott, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986).
 
 
 40
 Although the preclusive doctrine in Elliott was collateral estoppel, Elliott 's three preliminary requirements are at least instructive in the context of res judicata. One such requirement is that the claimants have had a full and fair opportunity to litigate the particular issue in the state administrative proceeding. See id. at 799, 106 S.Ct. at 3226. Similarly, we have held that for any claim to be barred by res judicata, the plaintiff must have had the opportunity to raise the claim in the first proceeding. See Securities and Exchange Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1463 (2d Cir.1996) ("[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (citation and internal quotations omitted), cert. denied, --- U.S. ----, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); see also Miller, 39 F.3d at 1038 (noting that preclusive effect is denied when "the parties lacked an adequate opportunity to litigate an issue").[4]
 
 
 41
 As it happens, however, the plaintiffs in the present case could not have raised their section 1983 claims in the administrative proceeding conducted by the fair hearing officer. According to Elizabeth Geary, Health Program Supervisor in the Medical Operations Division of DSS, at the time of plaintiffs' fair hearings, the administrative fair hearing officer was required to follow the MAP Manual provisions and lacked authority to hear challenges to these policies based on federal law.
 
 
 42
 Connecticut argues nevertheless that plaintiffs could have brought their federal claims in state court, to which they could have appealed after their administrative appeals were denied. But for the reasons stated in the prior section of this opinion, plaintiffs were not required to exhaust their state judicial remedies before bringing suit in federal court. See Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). Nor were they required to bring their federal claims (which were not viable in the administrative proceeding) in state court in order to avoid res judicata; such a requirement would effectively impose an exhaustion requirement. Accordingly, res judicata does not bar this action.
 
 II
 
 43
 To win a preliminary injunction, a party is ordinarily required to demonstrate "(1) that it is subject to irreparable harm; and (2) either (a) that it will likely succeed on the merits or (b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips 'decidedly' in favor of the moving party." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir.1997) (citation omitted). The showing required to win a preliminary injunction against a government is even more stringent:
 
 
 44
 [W]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.
 
 
 45
 Able v. United States, 44 F.3d 128, 131 (2d Cir.1995) (emphasis added) (quoting Plaza Health Lab., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989)). Thus these plaintiffs must demonstrate irreparable harm and a likelihood of success on the merits.
 
 
 46
 We review "a district court's entry of a preliminary injunction for abuse of discretion, which means that we may reverse only if the district court applied an incorrect legal standard, based its decision on clearly erroneous findings of fact, or issued an injunction containing an error in form or substance." Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir.1997).
 
 
 47
 Here, DSS's regulations at issue define DME, specifically exclude certain specific items that do not meet this definition, and limit DME coverage to those on the fee schedule. This structure dictates the order of our analysis, because the district court's injunction affected DSS's ability (i) to define DME to exclude certain specific items, and (ii) to limit DME to specific items that appear on its fee schedule.
 
 
 48
 First, we address the claim raised by the Emerson subclass, which poses the threshold question of a state's ability to define a type of medical service that federal statute and regulations require but give only the vaguest definitional shape. Next, we address the questions posed by the DeSario subclass: (i) whether and why a state may decline coverage for a medically prescribed and possibly necessary DME that is not expressly approved on the fee schedule, and (ii) who bears the burden of making one of the showings required to compel coverage.
 
 A. The Emerson Subclass
 
 49
 The part of the injunction that affects the Emerson subclass prohibits Connecticut from denying a request for DME solely on the ground that MAP Manual § 189.E.III.a excludes it from coverage. It is undisputed that the appliances excluded in § 189.E.III.a that are at issue here--air conditioners, roomsize humidifiers and air purifiers--fall outside Connecticut's general definition of DME. However, the district court reasoned that DSS may not exclude these items unless the state had considered on some level whether these items were "medically necessary" (either for the particular Medicaid recipient or for the Medicaid population as a whole). Finding that DSS had failed to consider medical necessity on any level prior to excluding this equipment from coverage, the district court enjoined DSS from denying coverage on the basis of this regulation.
 
 
 50
 The district court's approach elides a threshold question. No matter how medically necessary a thing may be to a particular person (gloves are medically necessary to persons exposed to frost; a dwelling is medically necessary to an agoraphobe) or even to the population as a whole, the state need not (and in fact cannot) provide it unless it falls within a covered medical service.
 
 
 51
 Title XIX provides that a state satisfies its statutory obligations by adopting "reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... are consistent with the objectives of this subchapter." 42 U.S.C. § 1396a(a)(17) (1994). Among the services provided by the Connecticut plan are "home health care services," which the regulations define to include "medical ... equipment." See 42 U.S.C. § 1396d(a)(xi)(7); 42 C.F.R. § 440.70(b)(3) (1996). Thus, the statute permits states to adopt "reasonable standards" for determining what items of equipment qualify as medical equipment, and are covered.
 
 
 52
 Connecticut defines Medicaid DME as reusable equipment that primarily and customarily serves a medical purpose and "[g]enerally is not useful to a person in the absence of an illness or injury." MAP Manual § 189.B. This definition of DME is almost identical to the wording and substance of the federal regulation that defines Medicare DME:equipment, furnished by a supplier or a home health agency that--
 
 
 53
 (1) Can withstand repeated use;
 
 
 54
 (2) Is primarily and customarily used to serve a medical purpose;
 
 
 55
 (3) Generally is not useful to an individual in the absence of an illness or injury; and
 
 
 56
 (4) Is appropriate for use in the home.
 
 
 57
 42 C.F.R. § 414.202 (1996). It is true that the Medicare program differs in many respects from Medicaid and that comparisons of benefits offered under the two programs are not always useful. See, e.g., Skubel v. Fuoroli, 113 F.3d 330, 336 (2d Cir.1997). At least, however, the use of identical definitions by Connecticut and the Department of Health and Human Services ("HHS") subverts the allegation that Connecticut's definition is unreasonable.
 
 
 58
 Moreover, HHS has expressly endorsed Connecticut's definition of DME as reasonable. The Secretary of HHS, as a third-party defendant in this action, submitted a brief to the district court, in which she expressed the view that
 
 
 59
 under federal law, the State ... may adopt a reasonable definition of "medical supplies, equipment and appliances." Applying that standard, the State could reasonably define this term to exclude specific items which are not primarily and customarily used to serve a medical purpose, and which are customarily used for other purposes.
 
 
 60
 Brief of Third-Party Defendant Donna Shalala at 3. The Secretary added:
 
 
 61
 [T]he State has apparently adopted a reasonable definition of medical equipment which is based in part on the definition used by the Secretary under the Medicare program.... For example, while air conditioners serve a valuable environmental control purpose, they are not generally considered medical equipment. It is reasonable to consider air conditioning costs as a general housing cost, rather than as a medical expense.
 
 
 62
 Id. at 10 (emphasis in original). The Secretary's brief observed that comparison to the Medicare definition was appropriate in this instance because "with respect to medical equipment, the Secretary has not required that States adopt the Medicare definitions, but has permitted States to do so in whole or in part." Id. at 11.
 
 
 63
 An agency's interpretation of the statute covering a program it administers should receive substantial deference. As we said, with reference to the Medicaid statute, in Connecticut Hospital Association v. Weicker, 46 F.3d 211 (2d Cir.1995):
 
 
 64
 "An agency's interpretation of a statute that the agency administers is entitled to considerable deference; a court may not substitute its own reading unless the agency's interpretation is unreasonable." Skandalis v. Rowe, 14 F.3d 173, 178 (2d Cir.1994).... Adherence to this doctrine is "even more appropriate where, as here, we consider a small corner of a labyrinthine statute." Id. Where the agency has advanced its interpretation, and where, as here, the meaning of that statute is ambiguous, " 'we must defer to the agency's resolution of the matter if it is based on a permissible construction of the statute and is sufficiently reasonable.' " Id. at 179 (quoting Detsel by Detsel v. Sullivan, 895 F.2d 58, 62 (2d Cir.1990) (internal quotation and citation omitted)). No one would contend that this statutory scheme is so intuitive and transparent that administrative input gives no useful guidance.
 
 
 65
 Id. at 219.
 
 
 66
 We give ready deference to the Secretary's assessment. DSS's definition of DME establishes a rational distinction between equipment that is primarily medical in nature, and devices principally employed for non-medical purposes that might incidentally benefit someone with a particular condition.[5] See, e.g., Hosking v. State Farm Mutual Auto. Ins. Co., 198 Mich.App. 632, 499 N.W.2d 436, 438 (1993) (interpreting "durable medical equipment" in policy as "equipment primarily used for a medical purpose", and holding that definition did not include lift-equipped, modified van). It is not unreasonable for a state to refuse funding for air conditioners or roomsize humidifiers, even for those whose doctors can point to some medical need. See Dougherty v. Department of Human Servs., 91 N.J. 1, 449 A.2d 1235, 1238 (1982) (upholding exclusion of air conditioners and air humidifiers from Medicaid coverage as DME).
 
 
 67
 If plaintiffs were correct, the state might be required to fund the other equipment and supplies that Emerson's doctor has prescribed as medically necessary, including "clear glass cookware and table dishes," "electric heaters," "[a]ll natural bedding," "vacuum cleaner designed for allergic and chemically sensitive people," and "organic food, [and] bottled water in glass bottles." Moreover, in addition to limiting coverage to purely medical devices, Connecticut's definition has the added benefit of guarding against moral hazard; after all, depending on how broad the range of a person's afflictions, plaintiffs' definition of DME would cover all the necessaries of life, and some of its amenities.
 
 
 68
 In summary, we conclude: that Connecticut's definition of DME is reasonable and permissible under Title XIX; that because the definition is reasonable, Title XIX does not require Connecticut to supply equipment that falls outside that definition; that air conditioners, air purifiers, and roomsize humidifiers are not DME under this definition[6]; that MAP Manual § 189.E.III.a (at least as to those items at issue here) is therefore a valid limitation of DSS's Medicaid coverage; and that DSS properly denied Emerson and Stevenson's requests on this basis. Accordingly, the district court abused its discretion in enjoining defendant from basing its denial of DME requests solely on MAP Manual § 189.E.III.a.
 
 B. The DeSario Subclass
 
 69
 Unlike the Emerson subclass, the equipment requested by the representative plaintiff of the DeSario subclass and Slekis--an environmental control unit and a RIK mattress--meet the definition of DME; their requests for prior authorization were rejected by DSS because these items of equipment were not included on DSS's fee schedule.[7] The district court decided that although the use of a list to determine DME coverage is not illegal in every situation, the list in this case violated Title XIX because it did not provide sufficient coverage of DME. The district court enjoined Connecticut from denying coverage simply because a particular item of DME does not appear on the fee schedule. The district court later clarified the injunction to preclude Connecticut from requiring a Medicaid recipient seeking reimbursement for unscheduled DME to demonstrate that the fee schedule is inadequate with respect to the needs of the Medicaid population as a whole.
 
 
 70
 We conclude that the injunction entered in aid of the DeSario subclass must be vacated because:
 
 
 71
 (1) The district court erred in its (in part implicit) ruling that every medically necessary item of equipment satisfying the state's definition of DME must be provided. In fact, the state's coverage is sufficient if it provides DME adequate to meet the needs of the Medicaid population of the state.
 
 
 72
 (2) The district court erred in finding that the plaintiffs had demonstrated a likelihood of success in proving that the fee schedule violated Title XIX.
 
 
 73
 1. Program Sufficiency: the Individual Medicaid Recipient
 
 
 74
 The district court concluded that a state's use of a list of covered equipment does not in itself violate Title XIX, but held that DSS's fee schedule provides insufficient coverage because: (i) DSS lacks an adequate procedure for updating the fee schedule with new products meeting its definition of DME; and (ii) DSS lacks a procedure for a Medicaid recipient to show that a particular item of unscheduled equipment is medically necessary and meets DSS's definition of DME, such that it can be added to the list or considered for prior authorization. DeSario, 963 F.Supp. at 130, 141-42.
 
 
 75
 We agree that Connecticut's use of a list of covered equipment is permissible. A 1977 Medical Assistance Manual issued to state agencies administering medical assistance programs by HCFA included the following advice:
 
 Question 5
 
 76
 May the State limit medical supplies and equipment?
 
 Answer
 
 77
 Yes. States may place a money ceiling upon medical supplies and equipment based on a reasonable, fixed dollar amount per month or per year; or may require prior authorization for items costing more than a certain amount; or may list those items for which it will reimburse; or may require prior authorization for durable equipment.
 
 
 78
 HCFA Medical Assistance Manual, § 5.50.1-00 (Feb. 16, 1977) (emphasis added). The Secretary took the same position in her brief to the district court: "To define covered items or services, a specific list of covered items and services would be consistent with the requirements of federal law." Brief of Third-Party Defendant Donna Shalala at 7. As noted, we defer to the agency's interpretation of the statute it enforces, as long as the interpretation is reasonable, which, as plaintiffs seem to concede, it is here. Thus, Connecticut's use of a list of covered DME was not itself improper.
 
 
 79
 As the district court observed, Connecticut does not allow coverage of unscheduled DME even if the item for which coverage is sought could be shown to fall within Connecticut's definition of DME. DSS does not itself review new DME products to see if they fall within the DME definition or allow an individual applicant for prior authorization to make this showing. Inevitably, then, some equipment that falls within Connecticut's definition of DME and that is medically necessary to a particular Medicaid recipient, will be left outside the state's Medicaid coverage. The district court concluded that this renders the fee schedule insufficient. And in fact, the actual effect of the injunction is to remedy this perceived problem and to require the state to provide all equipment falling within the definition of DME that a treating physician determines is medically necessary for a Medicaid patient. According to the district court, for the list to be sufficient, DSS must add to the list any item meeting the definition of DME that is medically necessary for any Medicaid recipient. Once the item is on the list, the only reason for denial would be the recipient's lack of medical necessity.
 
 
 80
 When plaintiffs' able counsel was pressed at oral argument to identify valid reasons why a Medicaid recipient's request for DME might be denied in light of the injunction, he could specify two rationales only: (i) lack of medical necessity, and (ii) the availability of a less costly, equally efficacious item. And as to the latter rationale, counsel conceded that the efficacy of an alternative item is tied into the physician's determination of medical necessity (i.e., that a physician would not state that a particular item of DME is medically necessary unless there was no other, more effective DME available) and that the treating physician is entitled to almost complete deference in determining medical necessity. Thus, as the injunction operates, the state must provide any item of DME that the treating physician prescribes as medically necessary.[8]
 
 
 81
 But the fact that a particular Medicaid recipient may not receive an item of DME that his doctor has opined is medically necessary does not render the fee schedule's coverage insufficient under Title XIX unless the state is obligated to cover every medically necessary item that falls within its definition of DME. We hold that a state need not fund every medically necessary item of DME that falls within the state's definition of DME and therefore, the district court attached undue significance in its Title XIX analysis to the absence of procedural devices for obtaining coverage for equipment that falls within the definition of DME but is not included on the fee schedule.
 
 
 82
 There is no requirement that a state fund every medically necessary procedure or item falling within a service it covers under its plan. To begin with, medical necessity and coverage are distinct concepts; a patient's medical necessity does not determine whether a particular item or service is covered. As the Secretary noted in her brief below:
 
 
 83
 [F]ederal law requires that States deny Medicaid payment for services which are not described in the approved State plan (and implementing regulations or policies) as a covered item or service.... Assuming that an item or service is covered under the State plan, however, Medicaid payment is only required for items or services which are medically necessary.... Thus, for Medicaid payment to be proper, the item or service furnished must be both covered and medically necessary.
 
 
 84
 Brief of Third-Party Defendant Donna Shalala at 6-7 (emphasis in original).
 
 
 85
 Title XIX affords states great latitude in determining the scope and extent of coverage of medical services. See Roe v. Norton, 522 F.2d 928, 933 (2d Cir.1975). This latitude is subject to certain federal statutory and regulatory limitations. As noted above, Title XIX requires that the plan "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... are consistent with the objectives of this subchapter." 42 U.S.C. § 1396a(a)(17) (emphasis added). It is not an objective of the Medicaid program to furnish all things medically necessary unless they are expressly excluded. The program's objective is expressed in Title XIX:
 
 
 86
 as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care....[9]
 
 
 87
 42 U.S.C. § 1396 (emphasis added); see also New York City Health & Hosps. Corp. v. Perales, 954 F.2d 854, 868 (2d Cir.1992) (Cardamone, J., dissenting). In addition, the plan must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).
 
 
 88
 Although these statutory guidelines are broadly stated, they are clear enough to indicate that the state need only fund medical services through reasonable standards that are consistent with Title XIX's objective of providing medical assistance, as far as practicable, to the categorically and medically needy and in the best interest of the recipients; there is nothing in the statute which mandates comprehensive coverage of all medically necessary services, even all of those services provided by the state. As the Secretary notes in her brief, "[a]lthough 42 U.S.C. § 1396a(a)(19) requires that services must be furnished 'in the best interests of recipients,' that does not limit a State's ability to impose amount, duration and scope limitations which may affect some individuals more than others." Brief of Third-Party Defendant Donna Shalala at 6 n. 2 (citing Alexander v. Choate, 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985)).[10]
 
 
 89
 Regulations promulgated pursuant to Title XIX reinforce the view that the statute does not require states to cover all medically necessary services, even within the covered categories of services. Rather, in order to be consistent with the objectives of Title XIX, "[e]ach service [provided by the state plan] must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b) (1996). The regulations also provide that "[t]he agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d) (1996) (emphasis added). Disregarding the words we have underscored in the foregoing provision, plaintiffs claim that the identified criteria constitute the exclusive grounds for limiting a category of Medicaid service. But we read the regulation's use of the words "such criteria as" to mean that these are examples. See, e.g., Health Care Financing Administration, Proposed Rules, Payment for Covered Outpatient Drugs under Drug Rebate Agreements with Manufacturers, 60 Fed.Reg. 48442, 48458 (1995) (noting that prior to enactment of an amendment to Title XIX in 1990 applicable to prescription drugs only, "[s]tates could establish amount, duration, and scope restrictions on Medicaid services, including prescription drugs .... based on such criteria as medical necessity and utilization control, or [these restrictions] could be based on other factors so long as the amount of the services provided was sufficient to 'reasonably achieve its purpose' ") (emphasis added). Moreover, the statute itself in using the term "as far as practicable," clearly signals that states may also allow budgetary and cost considerations to influence their coverage decisions. See Charleston Mem'l Hosp. v. Conrad, 693 F.2d 324, 330 (4th Cir.1982); Dodson v. Parham, 427 F.Supp. 97, 104 (N.D.Ga.1977) (noting that Title XIX "expressly recognizes financial matters as relevant considerations in fashioning Medicaid programs").
 
 
 90
 The Supreme Court clarified the mandated amount, duration and scope of coverage in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977): "[N]othing in the [Medicaid] statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care." Id. at 444, 97 S.Ct. at 2370-71. Rather, the statute "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." Id. The Court suggested without elaboration that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." Id.
 
 
 91
 In Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), however, the Supreme Court further clarified the boundaries of state discretion in Medicaid coverage. There, a group of disabled Medicaid recipients challenged Tennessee's new 14-day limit on inpatient hospital stays on the ground that the limit violated the Rehabilitation Act because it disproportionately affected disabled persons and denied them meaningful access to Medicaid benefits. The Court, in its Rehabilitation Act analysis, found that Tennessee's decision to limit the number of hospital days did not deny disabled persons meaningful access to state Medicaid services because they could take advantage of the covered 14 days just as easily as non-disabled individuals:
 
 
 92
 To the extent respondents further suggest that their greater need for prolonged inpatient care means that, to provide meaningful access to Medicaid services, Tennessee must single out the handicapped for more than 14 days of coverage, the suggestion is simply unsound. At base, such a suggestion must rest on the notion that the benefit provided through state Medicaid programs is the amorphous objective of "adequate health care." But Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services, such as 14 days of inpatient coverage. That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered--not "adequate health care."
 
 
 93
 Id. at 302-03, 105 S.Ct. at 721 (emphasis added). The Court noted that the Medicaid statute gave "the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients,' " id. at 303, 105 S.Ct. at 721 (quoting 42 U.S.C. § 1396a(a)(19)), and that the 14-day limitation was in the best interests of the recipients because, as the district court found, 95% even of the disabled individuals eligible for Medicaid were fully served even with this limitation.[11]
 
 
 94
 As other circuits have recognized, a state may impose coverage limitations that result in denial of medically necessary services to an individual Medicaid recipient, so long as the health care provided is adequate with respect to the needs of the Medicaid population as a whole. For example, in Curtis v. Taylor, 625 F.2d 645 (5th Cir.1980), plaintiffs claimed that a limitation of coverage adopted by Florida (three physician visits per month) was insufficient under Title XIX and its regulations. The court endorsed the Department of Health, Education and Welfare's view that "a limitation on the 'amount, scope or duration' of a required service [is] 'reasonable' if the coverage provided is adequate to serve the medical needs of most of the individuals eligible for Medicaid assistance." Id. at 653. The plaintiffs did not dispute that Florida's plan met that standard; as the court noted, only 3.9% of the Medicaid population required more than three visits in any month, and only .5% required in excess of three visits in more than one month. Id. at 651 n. 10.
 
 
 95
 Similarly, in Charleston Memorial Hospital, the Fourth Circuit held that South Carolina's reduced coverage (inpatient hospital coverage, with some exceptions, had been cut from 40 days to 12 days a year, and outpatient hospital visits had been reduced to 18 visits per year) was "sufficient in amount, duration and scope to reasonably achieve [the services'] purpose[s]." 693 F.2d at 330. According to the court, the remaining services were "adequate to service the needs of most of the individuals eligible for Medicaid assistance" because the 12-day inpatient limit met the needs of 88% of Medicaid recipients requiring inpatient care and the 18 visit outpatient limit met the needs of 99% of Medicaid recipients requiring such care. Id.; see also Virginia Hosp. Ass'n v. Kenley, 427 F.Supp. 781, 785-86 (E.D.Va.1977) (holding that Virginia's 21-day limitation on inpatient hospital coverage complied with Title XIX and deferring to Department of Health, Education and Welfare's interpretation of the statute that "services provided reasonably achieve their purpose if the amount, scope and duration would be sufficient for most persons needing that type of care") (emphasis in original); Dougherty v. Department of Human Servs., 91 N.J. 1, 449 A.2d 1235, 1237 (1982) ("We have never held that our statutory program requires state reimbursement for all medically necessary services for every patient.").
 
 
 96
 Plaintiffs seek to distinguish these cases on the ground that they involved limits on the amount and duration of coverage, rather than limits on the scope of coverage, and that scope limitations are subject to different federal standards, which we are invited to invent. We see no basis for that distinction in the statute, regulations, or the case law. A limit on the length of hospital stays will obviously leave uncovered the medically necessary hospitalization of some persons. Put bluntly, discharge from a hospital after 14 days would be a death sentence for some patients. Like Ms. DeSario, who uses a donated (but inferior) environmental control unit, the Medicaid recipient with a foreshortened hospital stay is forced by limited Medicaid coverage to seek other resources in the community.
 
 
 97
 The Health Care Financing Administration, the division within HHS which administers the Medicaid program, seems to have adopted this view of the sufficiency requirement. Its guidelines for state coverage of organ transplants provide that states may choose to cover none, some or all organ transplants. Health Care Financing Administration, Department of Health and Human Services, State Medicaid Manual, HCFA Guidelines on Organ Transplants, Pub. 45-4, § 4201, Transmittal No. 39 (Nov.1988) (hereinafter "Organ Transplant Guidelines"). However, if a state chooses to provide some coverage, the services must be reasonable in amount, duration and scope to achieve their purpose. Id.; see 42 C.F.R. § 441.35 (1996). Sufficiency is determined as follows:
 
 
 98
 States may cover transplants up to a dollar or day limit and may refuse to continue coverage beyond such limits, even if the patient is currently in a transplant program. However, any limits applicable to transplants, whether in terms of dollars or days, should be reasonably related to the dollars or days necessary to cover the particular type of transplant for most transplant patients in the Medicaid-eligible population.
 
 
 99
 Organ Transplant Guidelines, supra.
 
 
 100
 In short, we find no support in the statute, regulations and Supreme Court precedent, for requiring that a state cover every medically necessary item of DME.[12]
 
 
 101
 Moreover, a requirement that states provide all medically necessary services within their covered categories of services would in effect constrict the state's ability to enforce any limitation on coverage, even one based on lack of medical necessity. Cases that have required states to fund all medically necessary services have also emphasized that the patient's physician deserves almost complete deference in determining medical necessity. See, e.g., Weaver v. Reagen, 886 F.2d 194, 200 (8th Cir.1989); Pinneke v. Preisser, 623 F.2d 546, 550 (8th Cir.1980) ("The decision of whether or not certain treatment or a particular type of surgery is 'medically necessary' rests with the individual recipient's physician and not with clerical personnel or government officials."). Under that interpretation of the statute, states would need to fund all medically necessary services, and a Medicaid recipient's physician would be able to create coverage by prescribing a particular procedure or item of equipment. Coverage would be unlimited and budgeting would be by blank check. Worse, many of the services enumerated in Title XIX are optional for the states: therefore, if the states were required to provide all medically necessary care within each service, the only cost control measure available to a state would be to avoid adopting new optional services under its Medicaid program, and to end some of the optional services that it already provides.
 
 
 102
 For all these reasons, we reject as baseless and unworkable the view (adopted by some circuits) that a state must cover all medically necessary services. See, e.g., Hern v. Beye, 57 F.3d 906, 911 (10th Cir.), cert. denied, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 494 (1995); Dexter v. Kirschner, 984 F.2d 979, 983 (9th Cir.1993) (as amended on denial of rehearing and rehearing en banc); Weaver, 886 F.2d at 198. We hold that Title XIX does not require that a state cover every item or service of home health care services that is medically necessary for each individual Medicaid recipient. Rather, the state must extend coverage through reasonable standards with (in the language of the Supreme Court) the "general aim of assuring that individuals will receive necessary medical care" and each category of service must be sufficient in amount, duration, and scope to adequately (although not fully) meet the needs of the Medicaid population of the state. See Alexander, 469 U.S. at 303, 105 S.Ct. at 721. That means that an individual with a rare condition or unusual needs, who must have a costly item of DME that Connecticut has not chosen to cover and that is needed by a handful of the Medicaid population, will have to look for other sources of assistance.
 
 
 103
 The district court therefore erred in its finding that the DSS fee schedule is insufficient under Title XIX by reason of the lack of procedures to add to the fee schedule equipment that meets the definition of DME.
 
 
 104
 2. Program Sufficiency: the Medicaid Population as a Whole
 
 
 105
 On plaintiffs' motion for clarification of the injunction, the district court applied the correct coverage standard under Title XIX but still found that the plaintiffs were likely to succeed on the merits. Here, too, the district court erred.
 
 
 106
 Plaintiffs have the burden of demonstrating that Connecticut's DME coverage does not comply with federal law. In general, the "normal assumption [is] that an applicant is not entitled to benefits unless and until he proves his eligibility." Lavine v. Milne, 424 U.S. 577, 584, 96 S.Ct. 1010, 1015, 47 L.Ed.2d 249 (1976). Such an assumption is at least as valid when the plaintiff attacks a plan that has been reviewed by a federal agency: in similar circumstances, when plaintiffs challenged a state's reimbursement rate plan that had been reviewed and approved by HCFA, we gave deference to the state plan and required that the plaintiff show that the plan was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" before ruling it invalid. See Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1313 (2d Cir.1991); see also Illinois Health Care Ass'n v. Bradley, 983 F.2d 1460, 1463 (7th Cir.1993) (holding that "deference entitles the reimbursement plan to presumption of regularity"); Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1164-65 (10th Cir.1988); Mississippi Hosp. Ass'n, Inc. v. Heckler, 701 F.2d 511, 516 (5th Cir.1983) ("A presumption of validity attaches to agency action, and the burden of proof rests with the party challenging such action."). And in Perry v. Dowling, 95 F.3d 231 (2d Cir.1996), we held that a state agency's interpretation of the Medicaid statute was entitled to deference because "Medicaid is a joint federal-state program that requires, among other things, HHS approval of state Medicaid plans and their implementation." Id. at 236.
 
 
 107
 Medicaid plans must be submitted to HCFA for review and a determination of whether they conform to the requirements of the statute and regulations. See 42 U.S.C. § 1316 (1994); 42 C.F.R. §§ 430.12-430.15 (1996). State plans are automatically approved unless HCFA disapproves them within 90 days. 42 C.F.R. § 430.16 (1996). Further, Title XIX requires that the federal government suspend payments to a state if that state's Medicaid plan ceases to comply with Title XIX. 42 U.S.C. § 1396c (1994). Although nothing in the record indicates that HHS's scrutiny of the state plans is searching or complete, the statute clearly recognizes agency oversight as the primary check on those plans. And that is as it should be, since HHS is much more familiar with the Medicaid program than courts.
 
 
 108
 As to Connecticut's program in particular, HHS advised the district court in its brief that "the Secretary [has not] found the Connecticut Medicaid plan to be out of compliance with federal law with respect to the treatment of [DME]." Brief of Third-Party Defendant Donna Shalala at 3. As to Connecticut's use of an exclusive list, the Secretary stated that "HCFA has made no finding that the referenced State policies are contrary to federal Medicaid law." Id. at 13. Because the plan has withstood regulatory oversight, there is no reason these plaintiffs should not bear a plaintiff's ordinary burden of demonstrating that the state plan violates federal law.
 
 
 109
 Plaintiffs argue that Medicaid recipients should only have the burden of proof as to information that is within their knowledge and that individual Medicaid recipients lack access to the Medicaid statistics needed to evaluate the adequacy of DME coverage for the Medicaid population as a whole. However, plaintiffs have discovery procedures at their disposal in this action, as well as in the state fair administrative hearing, see Conn. Gen.Stat. §§ 4-177b & 4-177c, and therefore bear no greater burden than in any other lawsuit.
 
 
 110
 Plaintiffs therefore bore the burden of demonstrating the insufficiency of the DSS fee schedule. But in concluding that plaintiffs were likely to succeed in proving that the fee schedule is inadequate with respect to the needs of the Medicaid population as a whole, the district court relied on the following factors: (i) the absence of a procedure for updating the fee schedule with newly developed DME, (ii) the lack of a procedure for a Medicaid recipient to demonstrate that medically necessary equipment falls within the definition of DME, and (iii) the fact that the fee schedule was developed and maintained with limited input from physicians having the appropriate specializations. DeSario, 963 F.Supp. at 142.
 
 
 111
 Given the allocation of the burdens and this record, we conclude that the district court abused its discretion in finding that plaintiffs would likely succeed in proving that the fee schedule was inadequate to serve the needs of the Medicaid population of the state. The absence of procedures for including every item of equipment that satisfies the definition of DME on the fee schedule does not prove the insufficiency of the fee schedule. Further, a DSS working group revised the fee schedule in 1996, and we have seen no requirement that DSS continuously evaluate newly developed DME. A "flood" of such products comes continuously to market, as plaintiffs' counsel readily conceded at oral argument, and there are few studies which evaluate this new equipment. In addition, the district court concluded that plaintiffs will likely be able to prove that the schedule is insufficient because of the absence of a doctor from the DSS working group. It is true that there are no doctors in the DSS group that developed the fee schedule; but it does include a nurse and a physical therapist, who are medical professionals.
 
 
 112
 In fact, Connecticut now provides Medicaid recipients an opportunity to appeal the denial of a prior authorization request for DME in a "fair hearing," at which the recipient may demonstrate that the absence of a particular item of DME from the fee schedule renders the schedule unreasonable and inadequate with respect to the needs of the Medicaid population of the state.[13] The reasonableness and adequacy of the fee schedule to the Medicaid population of the state has been expressed in percentage terms, see, e.g., Curtis v. Taylor, 625 F.2d 645, 653 (5th Cir.1980); Charleston Mem'l Hosp. v. Conrad, 693 F.2d 324, 330 (4th Cir.1982), but we do not preclude consideration (as part of this analysis) of whether a reasonable cost-benefit calculation could justify denying coverage of the unscheduled item of DME that the recipient is requesting.[14] Any such calculation by the state is of course entitled to great deference.
 
 
 113
 Given the availability of this hearing, any imperfection in the fee schedule can be cured through hearing-by-hearing consideration of the legality of excluding individual items of DME. Thus, the use of the fee schedule to deny coverage does not violate Title XIX, and the district court erred in enjoining DSS from using its fee schedule as the primary determinant of DME coverage.
 
 
 114
 In summary, the district court abused its discretion in enjoining DSS from using its fee schedule to deny coverage for DME because it misconceived a state's funding obligation under Title XIX and lacked a basis for its finding that plaintiffs were likely to succeed on their claim that Connecticut's fee schedule is inadequate to serve the needs of the Medicaid population as a whole. Further, the district court abused its discretion in enjoining DSS from requiring applicants for DME to "demonstrate that medical equipment covered by the department is inadequate with respect to the Medicaid population as a whole" in order to obtain coverage for DME not on the fee schedule. DeSario, 963 F.Supp. at 143. Accordingly, we vacate the injunction and remand to the district court for further proceedings consistent with this opinion.
 
 CONCLUSION
 
 115
 The district court's injunction is vacated and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Charles L. Brieant, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Defendant filed a third-party complaint against the Secretary of Health and Human Services. The Secretary is not a party to this appeal
 
 
 [2]
 If Potwora were still good law, we would know it. State courts almost always provide the opportunity for appealing state actions, and injunctive relief is frequently sought in section 1983 cases. See Alacare, Inc.-North, 785 F.2d at 967-68 ("In almost any case brought under Section 1983 there will be some sort of administrative or judicial avenue of relief at state law ..."). Yet--probably because Potwora and Wallace cannot be squared with more recent Supreme Court authority--we have not cited them for over twenty years, and we have ordered injunctive relief in section 1983 cases where a state remedy at law, such as a state court appeal of a state administrative action, undoubtedly existed
 
 
 [3]
 Of course, a plaintiff is not deprived of due process when an adequate state proceeding exists to challenge the objectionable state action and the plaintiff chooses not to pursue that course. See Giglio v. Dunn, 732 F.2d 1133, 1135 (2d Cir.1984). This opinion does not alter that principle
 We note also that the Younger abstention doctrine requires that federal courts abstain from considering section 1983 claims that are the subject of ongoing state criminal proceedings or civil proceedings which involve vital state interests, when those proceedings provide an adequate opportunity to raise the federal claims. See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Assoc., 457 U.S. 423, 431-32, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). That doctrine is animated by comity concerns which override section 1983's expansive scope and which are not applicable in the absence of such an ongoing state proceeding or when a federal injunction would not impinge on vital state functions. The defendant does not challenge the district court's conclusion that because there is no ongoing state proceeding in this action, this doctrine is inapplicable.
 
 
 [4]
 The Ninth Circuit is the only Circuit to apply res judicata to unreviewed state administrative proceedings. See Miller, 39 F.3d at 1034-35. Miller applied res judicata to bar a section 1983 action against a county when an administrative panel had ruled that the county's actions were lawful. But even in Miller, the court required that the plaintiff have had the opportunity to raise the federal issue in the state administrative proceeding; the district court noted specifically that "plaintiff has not presented any evidence to the court in support of his contention that he could not have raised his civil rights claims before the Commission." Miller v. County of Santa Cruz, 796 F.Supp. 1316, 1319 (N.D.Cal.1992), aff'd, 39 F.3d 1030 (9th Cir.1994); see also Eilrich v. Remas, 839 F.2d 630, 634 (9th Cir.1988) (noting that plaintiff had litigated First Amendment claim--the claim asserted in his subsequent section 1983 action--in state administrative proceeding and holding federal suit barred by res judicata); Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1283-84 (9th Cir.1986) (holding that state agency determination in unemployment hearing did not preclude federal employment discrimination claim because plaintiff did not have adequate opportunity to present discrimination claim before agency), abrogated on other grounds, Astoria Fed. Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)
 
 
 [5]
 Connecticut's distinction between medical and non-medical equipment is properly based on the primary uses of an item rather than nomenclature. Thus, for example, Connecticut covers special types of humidifiers which are "durable for extensive supplemental humidification during IPPB treatments or oxygen delivery" but not roomsize humidifiers useful in everyday life
 
 
 [6]
 Plaintiffs concede that air conditioners, air purifiers, and roomsize humidifiers do not satisfy DSS's general definition of DME. But they argue that MAP Manual § 189.E.III.a, which enumerates DME not covered, introduces the list with the words "DME, including, but not limited to," thereby implicitly categorizing these appliances as DME even while excluding them from coverage. We do not think the imperfect syntax used by the compiler of this list of excluded items alters the express definition of DME. It would be a gross misreading of MAP Manual § 189.E.III.a, which was intended to exclude items from coverage, to read the introductory phrase in a manner that would expand coverage
 
 
 [7]
 The parties dispute whether environmental control units fall within Connecticut's definition of DME. However, DSS did not deny DeSario's request on the ground that environmental control units are not DME, but rather because such units are not included on the fee schedule. Therefore, for the purposes of this appeal only, we will treat environmental control units as if they fall within the definition of DME and determine whether denial based on MAP Manual § 189.E.II.a was lawful
 
 
 [8]
 The district court demonstrated that effect when it "clarified" its injunction and ordered that when DSS conducts its re-evaluation of Slekis's request for a RIK mattress, DSS consider only "Mr. Slekis's medical condition, the appropriateness of the RIK mattress as a device to meet Mr. Slekis's medical needs, and the ability of other items on the [DSS] fee schedule to meet his needs." DeSario, 963 F.Supp. at 142
 
 
 [9]
 Although plaintiffs claim that the use of the term "necessary medical services" in § 1396 requires that all medically necessary services be covered, such an interpretation is not supported by the context. As we have previously noted, "the phrase appears in Title XIX 'only as a limitation on persons eligible for Medicaid payments.' " Roe, 522 F.2d at 933 (quoting Roe, 380 F.Supp. at 728-29) (emphasis in original)
 
 
 [10]
 That Congress did not intend universal coverage of all medical needs is further confirmed by Congress' retrenchment in setting coverage goals. As originally enacted, Title XIX contained a provision that required each state to:
 make[ ] a satisfactory showing that it is making efforts in the direction of broadening the scope of the care and services made available under the plan ... with a view toward furnishing by July 1, 1975, comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources.
 Social Security Amendments of 1965, Pub.L. No. 89-97, § 1903(e), 79 Stat. 286, 350. This provision was repealed by the 1972 Social Security Act Amendments. Social Security Amendments of 1972, Pub.L. No. 92-603, § 230, 86 Stat. 1329, 1410. The House Report stated that the requirement was eliminated because of the committee's concern with the financial burden that the Medicaid program imposed on the states. H.R.Rep. No. 92-231, at 3, reprinted in 1972 U.S.C.C.A.N. 4989, 5086.
 
 
 [11]
 In a footnote, the Court stated: "Because that conclusion [that the 14-day limitation does not violate the Medicaid Act] is unchallenged, we express no opinion on whether annual limits on hospital care are in fact consistent with the Medicaid Act." Alexander, 469 U.S. at 303 n. 23, 105 S.Ct. at 721 n. 23. Although the court may not have answered the particular question as to whether these limitations on hospital care violated the Medicaid Act, it did not qualify or condition its holding that states need not cover all services medically necessary to the individual Medicaid recipient, but may choose the proper mix of coverage so long as care and services are provided in the best interests of all recipients and are adequate to meet the recipients' needs
 
 
 [12]
 The district court relied on Dodson v. Parham, 427 F.Supp. 97 (N.D.Ga.1977), to hold that Connecticut's DME coverage is insufficient by reason of inadequacies in DSS procedures for considering the supply of unscheduled items. However, the court in Dodson, like the district court here, misconceived the state's obligation under Title XIX
 
 
 [13]
 Connecticut originally barred its fair hearing officers from authorizing any unscheduled DME. However, after the district court issued its original injunction, Connecticut authorized its fair hearing officers to grant prior authorization requests for unscheduled DME if a Medicaid recipient could show that the failure to provide the requested DME rendered the list inadequate with respect to the needs of the Medicaid population as a whole. The district court then clarified its injunction and barred Connecticut from requiring that Medicaid recipients make this showing to receive unscheduled DME. For the purposes of this opinion, we assume that Connecticut will continue its practice of affording Medicaid recipients an opportunity to demonstrate at a fair hearing that the absence of the requested item of DME from the fee schedule renders the schedule unreasonable and inadequate with respect to the needs of the Medicaid population of the state
 
 
 [14]
 The cost-benefit analysis could, of course, run either way, i.e., could justify granting or denying coverage. Our language is cast in terms of denying coverage because the procedural circumstances in which this question will arise will always be that the state has denied a prior authorization request for DME and the fair hearing officer or the court is called upon to reverse this decision and order coverage